IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

**THEODORE WILLIAMS,**

      Plaintiff,

v.                                                            Civil Action No. 7:11-CV-144 (HL)

**CLEAVER-BROOKS, INC.**,

      Defendant.

## ORDER

This case is before the Court on Defendant's Motion for Summary Judgment (Doc. 21). After reviewing the pleadings, affidavits, depositions, and other evidentiary materials presented, the Court grants Defendant's motion.

## I.    FACTS

Defendant Cleaver-Brooks develops, manufactures, and distributes packaged boiler systems. It operates a facility in Thomasville, Georgia. (DSOMF ¶¶ 3-4).[1]

Defendant employs hourly paid workers to produce the boilers. These individuals work in a variety of classifications, but are primarily involved in either the production of component parts or the assembly of the final product. The hourly workers operate machines, weld, assemble, paint, or perform support

---

[1] "DSOMF" refers to Defendant's Statement of Material Facts. The cited paragraphs are those admitted by Plaintiff. "PSOMF" refers to Plaintiff's Statement of Material Facts. The cited paragraphs are those admitted by Defendant.

roles such as maintenance or material handling. (DSOMF ¶ 5). As part of their employment, the hourly workers are cross-trained in a variety of positions to allow the company to flex its workforce in response to particular production demands. (Declaration of Dennis Hettinger, ¶ 8). The employees cross-train throughout the plant when there is insufficient work available in a particular area. (Deposition of Everett Gaynor Hart, pp. 23-24; Deposition of Theodore Williams, pp. 63-64).

Plaintiff was one of these hourly workers. He began working at the Thomasville facility as a painter in August of 1994. (DSOMF ¶ 7). Plaintiff received some cross-training in the piping or pipefitting area. (Williams Dep., p. 64).

Employees were also periodically assigned to perform a variety of functions outside of their regular work duties, including sweeping the floors, picking up trash along the fence line outside, and spraying for weeds. These tasks were required of both black and white employees, and of both supervisors and non-supervisors. (DSOMF ¶¶ 12-14; Williams Dep., pp. 43-44, 46).

Plaintiff's supervisor from the fall of 2008 until July 22, 2010 was Everett Gaynor Hart. (Hart Dep., p. 12; Affidavit of Theodore Williams ¶ 11). Hart's position during that time period was shop floor supervisor, and he was assigned to supervise the final assembly department. (Hart Dep., p. 13). His duties

2

included scheduling, maintaining safety, keeping track of parts and supplies, and discipline, though any discipline write-ups had to be approved by Dennis Hettinger, the plant human resources manager. (Hart Dep., p. 13; Hettinger Decl., ¶ 15). Hart did not have the authority to terminate any employees, though he would discuss employment decisions with upper management. (PSOMF ¶ 86). Ultimate employment decisions, including hiring and firing, were made by Hettinger and Joseph McAuley, the plant manufacturing manager. (Hettinger Dep., p. 9; Deposition of Joseph McAuley, p. 7).

Early in 2010, Plaintiff agreed to work the night shift after Hart asked for volunteers. Plaintiff believed the assignment would last up to a month (Williams Dep., p. 41), but he ended up working partially on nights for approximately seven weeks. (Supplemental Declaration of Dennis Hettinger, ¶ 4, Ex. A). Plaintiff contends he asked Hart several times to be returned to the day shift, but was ignored. (Williams Aff., ¶ 30). He then went to Hettinger, who had Plaintiff moved back to the day shift. (Williams Aff., ¶ 30). According to Plaintiff, at the time he talked to Hettinger, he told him that "Hart did not treat me the same as the other employees, that he routinely berated me." (Williams Aff., ¶ 31).[2]

---

[2] In Section III(B) below, the Court addresses the sham affidavit doctrine in detail. Generally, a party cannot contradict earlier deposition testimony with a later affidavit without explanation. *See* Van T. Junkins & Assoc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984). Defendant requests that paragraph 31 of Plaintiff's affidavit be disregarded as a sham, as Plaintiff did not mention in his deposition that he told Hettinger that Hart did not treat him the same and routinely berated him. Upon review,

In late June 2010, Plaintiff told Hettinger that he was giving his two weeks' notice. (Williams Dep., pp. 46, 52; Deposition of Dennis Hettinger, p. 10).[3] Plaintiff reported that he was unhappy working with Hart, did not like moving back and forth between the day shift and the night shift, and did not enjoy the cross-training he was receiving. (DSOMF ¶ 23). Plaintiff complained that Hart had him outside picking up trash and spraying for weeds, that Hart was "cussing him,"[4] and that Hart was talking about Plaintiff to other employees. (Williams Dep., pp. 49-51). He did not complain about any racial discrimination or harassment when he met with Hettinger. (Hettinger Dep., pp. 10-11; Williams Dep., p. 46-51).

After the meeting with Hettinger, Plaintiff went on vacation. His requested vacation for June 25, 2010 and for June 28, 2010 through July 2, 2010 was approved by Hart. (Hettinger Supp. Decl., ¶ 8, Ex. E). Plaintiff returned to work on July 6, 2010. (Hettinger Supp. Decl., ¶ 8). Upon his return, Plaintiff met with Hettinger and McAuley. (Hettinger Dep., p. 13; McAuley Dep., p. 17; Williams

---

the Court does not find the testimony given in the affidavit to be inherently irreconcilable with the deposition testimony such that this portion of the affidavit is a sham.

[3] In his affidavit, Plaintiff contradicts much of the testimony given during his deposition with respect to the June 2010 conversation. This is discussed in greater detail in Section III(B) below. The Court has disregarded much of Plaintiff's affidavit on this point under the sham affidavit rule.

[4] The record shows that Hart cussed everyone - both blacks and whites. (Williams Dep., p. 36).

Dep., pp. 52-53). During that meeting, Plaintiff inquired about a transfer to the tubing department. (DSOMF ¶ 27). There is a dispute as to whether there was an available vacancy in the tubing department, but the dispute is immaterial as any position there would have been entry-level and Plaintiff was not willing to take a pay cut. (Williams Dep., pp. 48-49). Plaintiff stated that he did not want to quit, and according to McAuley, recanted his two weeks' notice. (McAuley Dep., pp. 16-17; Williams Dep., p. 53).[5]

Plaintiff was at that time cross-training in the piping area. After meeting with Hettinger and McAuley, Plaintiff returned to his piping duties. What follows is a series of events that led to Plaintiff's termination. In the Court's opinion it is not necessary to get into the minutia of the alleged policy violations because they do not affect the Court's ultimate findings. However, the Court will briefly discuss the events which occurred during the time period between July 15 and July 22.

In October of 2009, Plaintiff received a written warning for not showing up to work. (Williams Dep., Ex. 7). On July 15, 2010, a second written warning was prepared by Hart resulting from an incident where Plaintiff threw a broken valve in the trash in violation of company policy. (DSOMF ¶ 31; Williams Dep., p. 75;

---

[5] While Defendant insists that Plaintiff quit, the evidence viewed in the light most favorable to Plaintiff shows that he changed his mind about resigning. Setting aside Plaintiff's testimony, McAuley clearly testified that Plaintiff decided not to resign, and the various documents submitted to the Court reflect that Plaintiff was terminated, not that he quit. For purposes of this Order, the Court will proceed under the finding that Plaintiff was terminated, but that finding does not influence the ultimate outcome.

Hart Dep., Ex. 15).[6] On July 19 or July 20, Hart prepared a third written warning because Plaintiff left work early on July 19 without receiving permission from a supervisor. (Hart Dep., Ex. 18). Under Defendant's progressive discipline policy, this third infraction within a 12-month period called for a three-day suspension. (Hettinger Decl., ¶ 13; Hart Dep., Ex. 18). But the warning that called for the suspension did not become effective until signed off on by Hettinger, who was not at work on July 19. (Hettinger Decl., ¶¶ 55, 59).

On July 20, 2010, at approximately 6:00 a.m., Hart confronted Plaintiff and asked him why he had left work early on July 19. (DSOMF ¶ 60). Plaintiff responded that he thought his shift hours were over at 2:30 p.m., which is when he left. (DSOMF ¶ 61). According to Plaintiff, Hart then told him he was suspended for three days. (Williams Dep., pp. 87-88). So Plaintiff just turned around and walked out. (Williams Dep., pp. 88-89). Plaintiff did not call in on July 21, and did not report for work. (DSOMF ¶ 69). Plaintiff came back to the plant on July 22 and turned in his uniforms to Hettinger. (DSOMF ¶ 70). Plaintiff states that Hettinger told him he was being terminated for not showing up to work on July 21. (Williams Aff., ¶ 64). Plaintiff never returned to work at the company.

---

[6] Plaintiff admitted in his deposition that he threw away the broken part. Though he characterizes his actions as a mistake, he admits the violated company policy. (DSOMF ¶ 42).

At some point in time during his employment with Defendant, Hart had a Georgia State flag or Confederate flag sticker on his tool box. (Hart Dep., p. 15). The sticker was removed from the tool box sometime before Hart became a shop floor supervisor in 2008. (Williams Dep., pp. 128-29). Plaintiff alleges that Hart had a black figurine with a rope around its neck tied to his tool box, but the figurine was removed at least five or six years before Hart became a supervisor in 2008. (Williams Dep., pp. 37-38).[7] Hart also had a Georgia State flag or Confederate flag sticker on the cab window of his truck. (Hart Dep., p. 14). However, Plaintiff never complained about the presence of the flag sticker on Hart's tool box or about any other potentially racially-offensive items or symbols in the workplace. (DSOMF ¶ 20).

Plaintiff alleges that Hart regularly referred to him as "boy" when talking to him. (Williams Aff., ¶ 19). Another worker in the final assembly department, Bobby Trotman, regularly told Plaintiff to "get [his] black ass to work." (Williams Dep., pp. 118-119). On one occasion in 2008, prior to the presidential election, Plaintiff overheard Hart call Barack Obama a "nigger," and Plaintiff contends Hart

---

[7] In his deposition, Plaintiff testified that the flag sticker was removed from Hart's tool box before Hart became a shop floor supervisor, and that the figurine was removed five or six years before Hart became a supervisor. (Williams Dep., pp. 37-38, 128-29). However, in his affidavit submitted in response to Defendant's motion, Plaintiff states that the sticker and figurine were removed when Hart became shop floor supervisor. (Williams Aff., ¶ 17). The affidavit testimony is in direct conflict with the deposition testimony, and the two cannot be reconciled. Plaintiff has provided no explanation for the change in testimony. Thus, paragraph 17 of Plaintiff's affidavit will be disregarded.

called him a "nigger" once. (Williams Aff., ¶¶ 24-25). Plaintiff states that Hart "micro-managed" him and improperly singled him out at work. (Williams Aff., ¶ 26).

Plaintiff filed a two count complaint on October 18, 2011, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981. Plaintiff contends in Count One that he was discriminated against based on his race and in Count Two that he was retaliated against for reporting unlawful employment practices. Defendant now moves for judgment in its favor on both claims.

## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986) (internal quotations omitted)). Where the moving party makes such a

showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257, 106 S.Ct. 2505 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249–50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Trial Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348 (1986))."If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted).

### III.   ANALYSIS

#### A.   Count One - Disparate Treatment

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981. "Title VII and § 1981 have the same requirements of proof and use the same analytical framework." Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1256-57 (11th Cir. 2012) (internal quotations and citation omitted); Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir. 1985) ("Where, as here, a plaintiff predicates liability under Title VII or disparate treatment and also claims liability under section[ ] 1981 . . ., the legal elements of the claims are identical . . . [and] we need not discuss plaintiff's Title VII claims separately from his section 1981 . . . claim[ ].") Thus, the Court will

evaluate Plaintiff's disparate treatment claim under both Title VII and § 1981 using one framework.

Disparate treatment discrimination claims may be established either through direct evidence of discrimination or through circumstantial evidence that creates an inference of discrimination. Wright v. Southland Corp., 187 F.3d 1287, 1293 (11th Cir. 1999); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Plaintiff here attempts to prove his discrimination claim with both direct and circumstantial evidence. It is notable that if a plaintiff presents direct evidence of discrimination sufficient to win at trial, "'summary judgment is not appropriate even where the movant presents conflicting evidence.'" Merritt v. Dillard Paper Co., 120 F.3d 1181, 1189 (11th Cir. 1997) (quoting Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)).

### 1.    Direct evidence

Plaintiff first contends he has presented a direct evidence case of discrimination. He points to Hart's use of the term "boy," Hart calling Plaintiff "nigger" on one occasion, Hart referring to President Obama as a "nigger," and Trotman telling Plaintiff to "get [his] black ass back to work."

Direct evidence of discrimination "reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004).

Direct evidence of discrimination is evidence, that, "if believed, proves [the] existence of [a] fact in issue without interference or presumption." Burrell v. Board of Trustees of Ga. Military College, 125 F.3d 1390, 1393 (11th Cir. 1997). The proffered statements must both "reflect a discriminatory attitude and tie the discriminatory attitude to the relevant employment decision." Bernstein v. Sephora, Div. of DFS Group L.P., 182 F.Supp.2d 1214, 1216 (S.D. Fla. 2002) (citing Wright, 187 F.3d at 1294). Thus, comments by non-decision makers or remarks unrelated to the decision making process are not direct evidence. Standard, 161 F.3d at 1330. Further, "[t]o qualify as direct evidence of discrimination, [the Eleventh Circuit] require[s] that a biased statement by a decision-maker be made concurrently with the adverse employment event, such that no inference is necessary to conclude that the bias necessarily motivated the decision." Williamson v. Adventist Health System/Sunbelt, Inc., 372 F.App'x 936, 940 (11th Cir. 2010) (citing Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1359 (11th Cir. 1999)).

The comments relied upon by Plaintiff are unrelated to the decision-making process. It is undisputed that Hart did not have independent authority to terminate or even discipline Plaintiff. Any termination decision was made by Hettinger and/or McAuley, and there is no evidence that either of them ever made any racially-related comments. In addition, Plaintiff has presented no

evidence that any of the biased statements were made concurrently with this termination. Thus, the Court cannot conclude that Plaintiff has established a direct evidence case of disparate treatment.

However, Plaintiff also argues that Hart, his supervisor, harbored a discriminatory animus against Plaintiff and used Hettinger and McAuley as "cat's paws" to unlawfully terminate his employment.[8] Under a cat's paw theory, "causation may be established if the plaintiff shows that the decision maker followed the biased recommendation [of the employee] without independently investigating the complaint against the employee." Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999). "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." Id. A plaintiff operating under a cat's paw theory must "prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." Id. at 1331.

---

[8] "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward." Staub v. Proctor Hosp., --- U.S. ---, 131 S.Ct. 1186, 1190 n. 1 (2011) (internal citation omitted).

Plaintiff has not met his burden in establishing a cat's paw theory of liability. Plaintiff has offered no evidence that Hart had any "influence or leverage" over Hettinger or McAuley - the employees who made the decision to terminate Plaintiff. *See* Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226 (5th Cir. 2000). There is no evidence from which a jury could conclude that it was Hart who was principally responsible, not Hettinger or McAuley, for the decision to terminate Plaintiff. The evidence does not support the proposition that management served merely as a conduit for Hart's bias.

## 2.   Circumstantial evidence

As Plaintiff has not demonstrated direct discrimination, the Court must consider whether he has identified sufficient circumstantial evidence of discrimination. This means the Court must conduct an analysis under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973).

Under the McDonnell Douglas test, the plaintiff bears the initial burden of establishing a prima facie case. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). If the plaintiff "fails to satisfy any one of the elements of a prima facie case," summary judgment against the plaintiff is appropriate. Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1433 (11th Cir. 1998).

However, if a plaintiff establishes a prima facie case, the employer must then articulate a legitimate, nondiscriminatory reason for the challenged

employment action. <u>Pennington</u>, 261 F.3d at 1266. This burden is "exceedingly light;" the defendant must merely proffer a non-discriminatory reason, not prove it. <u>Perryman v. Johnson Prods. Co.</u>, 698 F.2d 1138, 1142 (11th Cir. 1983). "The defendant need not persuade the court that it was actually motivated by the proffered reasons. . . .It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." <u>Id.</u>

If the employer can give an appropriate explanation, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's explanation is merely a pretext. <u>Id.</u> A plaintiff cannot establish pretext by simply demonstrating facts that suggest discrimination, but must specifically respond to the employer's explanation and rebut it. <u>Crawford v. City of Fairburn, Ga.</u>, 482 F.3d 1305, 1309 (11th Cir. 2007). Pretext evidence is that which demonstrates "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation omitted). It is important to remember that an employer may make an employment decision for a "good reason, a bad reason,  . . . or no reason at all as long as its action is not for a discriminatory reason." <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1030 (11th Cir. 2000) (quotation omitted).

The Court must first consider whether Plaintiff has established a prima facie case of discrimination. To establish a prima facie case of disparate treatment, a plaintiff must show: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was treated less favorably than a similarly-situated individual outside his protected class; and (4) he was qualified to do the job.  Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006); Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep=t of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003). Defendant concedes that Plaintiff is a member of a protected class but argues that Plaintiff cannot meet prongs two, three, or four of the prima facie test. The Court agrees that Plaintiff cannot meet the third prong of the test.

Defendant argues that Plaintiff has failed to identify a similarly situated, non-minority employee who was treated more favorably than Plaintiff. To establish a prima facie Title VII case, the plaintiff must show that his employer treated similarly situated employees outside his classification more favorably than himself. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (citing Coutu v. Martin Cty. Bd. of Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995)). "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are

disciplined in different ways." Id. (citing Williams v. Ford Motor Co., 14 F.3d 1305, 1309 (8th Cir. 1994)). "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." Id. (citing Mack v. Great Atlantic & Pacific Tea Co., 871 F.2d 179, 182 (1st Cir. 1989)).

Plaintiff admits that he cannot identify a comparator or white co-worker who was treated more favorably, but argues that based on the Eleventh Circuit decision in Smith v. Lockheed-Martin Corp., 644 F.3d 1321 (11th Cir. 2011), he should survive summary judgment. The court in Smith stated that "establishing the elements of the McDonnell Douglas framework is not, and was never intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. . . .Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Id. at 1328.[9] Plaintiff argues that he has presented "a convincing mosaic of circumstantial

---

[9] The Court notes with interest Chief Judge Steele's summary judgment order in Bell v. Crowne Mgmt., LLC, 844 F.Supp.2d 1222 (S.D. Ala. 2012), a case where the plaintiff also claimed that she presented sufficient evidence pursuant to Smith to ward off summary judgment in the absence of valid comparator evidence. Chief Judge Steele stated that the suggestion set forth by Smith that the McDonnell Douglas burden-shifting paradigm can be ignored in a circumstantial evidence case, freeing the plaintiff from any obligation to establish a prima facie case, is in tension not only with Eleventh Circuit precedent, but also with McDonnell Douglas itself, which states: "The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." 411 U.S. at 802. Bell, 844 F.Supp.2d at 1232.

evidence that would allow a jury to infer intentional discrimination by the decisionmaker," which would create a triable issue of fact under Smith. Id. (quotations omitted). Plaintiff's circumstantial evidence on this point consists of the following: (1) Hart routinely referred to him as "boy"; (2) Hart called Plaintiff a "nigger" once and once referred to President Obama in the same way; (3) Trotman, a co-worker, told Plaintiff to "get [his] black ass back to work"; (4) Hart had a Confederate flag on his truck; (5) Hart had a Confederate flag sticker on his toolbox; (6) Hart had a black figurine on his toolbox; (7) Hart would not move Plaintiff back to the day shift; (8) Hart "micro-managed" Plaintiff's work; and (9) Hart made Plaintiff do menial labor outside the plant.

Much of this evidence does not support Plaintiff's position. Both black and white employees were required to pick up trash and clean up outside the plant. Hart removed the sticker from his toolbox and made the derogatory statements about President Obama and Plaintiff in 2008 at the latest - at least three years before Plaintiff's termination. Even assuming that Hart did have the figurine on his toolbox, which is disputed by everyone who has testified in this case other than Plaintiff, it was removed five or six years prior to Hart becoming a supervisor in 2008. As for the Confederate flag on Hart's truck, the only evidence in the record is that the sticker existed. The Court can safely assume that the truck remained in the parking lot all day, and as Plaintiff generally worked inside the

plant, he did not have to see the sticker on a constant basis, if at all. Further, there is no evidence that keeping Plaintiff on the night shift had anything to do with his race.

Thus the Court is just left with the allegations that Hart "regularly" called Plaintiff "boy" and that a co-worker "regularly" told Plaintiff to get his "black ass back to work." The Court finds that this evidence is not sufficient to establish the "convincing mosaic" required to survive summary judgment. Smith involved the termination of a white supervisor for distributing a racially-insensitive email targeting blacks during a time in which his employer was subjected to intense public scrutiny regarding its purported tolerance of racial hostility against blacks by whites in the workplace in relation to an apparently racially-motivated mass shooting by a white supremacist employee. 644 F.3d at 1324, 1329-35. The Eleventh Circuit decided that the plaintiff could survive summary judgment despite the fact that he could not identify a comparator because the plaintiff produced a significant evidentiary record that Lockheed-Martin had considered the plaintiff's race in its decision to terminate him. The evidence in Smith included a documented history of disparate treatment of white and black employees, a spreadsheet listing the employees by name and race that the defendant's disciplinary review committee used to make discipline decisions, a news program reporting the defendant's struggles with racism in the workplace, and a backdrop

19

of racial tension following a workplace shooting. There is nothing comparable in the record currently before the Court. While the Court is in no way discounting what was said or the effect of the statements on Plaintiff, the evidence simply is not enough to create the required convincing mosaic of circumstantial evidence needed to overcome the lack of comparator evidence.[10] *See also* Dorvil v. Advance Stores Co., Inc., No. 10-60036-Civ., 2011 WL 6069362, at *14 (S.D. Fla. Dec. 6, 2011) (finding that the relationship between the decision maker's comments about the plaintiff's race and national origin to be too attenuated to establish an inference of discrimination);[11] *see also* Davis v. Dunn Const. Co.,

---

[10] The Eleventh Circuit has on several occasions deemed similar evidence insufficient to get plaintiffs past summary judgment in hostile work environment cases. The Court believes that if the evidence would not support a hostile work environment claim, it certainly would not constitute the "comparably powerful" evidence necessary for the Court disregard the McDonnell Douglas test. Bell, 844 F.Supp.2d at 1234 ("Any substitute evidence must be comparably powerful in order to preserve to the prima facie case its gate-keeping function as ordained by the Supreme Court.") For instance, in Alexander v. Opelika City Schs., 352 F.App'x 390, 393 (11th Cir. 2009), the Eleventh Circuit affirmed the district court's grant of summary judgment where a plaintiff testified that he was called "boy" "constantly," but could only recall eight specific instances over the course of two years where he was called that term. Plaintiff here notably does not attempt to identify any specific instances where he was called "boy." Similarly, in McCann v. Tillman, 526 F.3d 1370, 1378-79 (11th Cir. 2008), the court found that a black employee's allegations that a white employee called her "girl" and two male black employees "boys," and that another coworker referred to a former black employee as a "nigger bitch," were not severe or pervasive harassment. Also, in Washington v. Kroger Co., 218 F.App'x 822, 825 (11th Cir. 2007), the court found that there was no racially hostile work environment when a co-worker allegedly hung a figurine representing the plaintiff by a rope and called the plaintiff racially-suggestive names, including "boy."

[11] The plaintiff in Dorvil was black and Haitian. He argued that certain comments made by his supervisor who was directly responsible for the plaintiff's termination created an inference of discrimination. The plaintiff claimed that the decision maker mimicked the

Inc., --- F.Supp.2d ---, 2012 WL 1952125 (finding other race discrimination charges and allegations insufficient to support a mosaic claim).  Plaintiff has not provided the Court with any reason to look beyond the McDonnell Douglas test, and thus cannot survive summary judgment.

It should also be noted that none of the evidence identified by Plaintiff on this point relates to his termination or can be attributed to the decision makers who in fact terminated Plaintiff. The Court rejected Plaintiff's cat's paw theory above. For purposes of skirting the McDonnell Douglas framework through a mosaic of evidence, the evidence must point to or lead to a permissible inference of intentional discrimination by the decision maker - here, Hettinger and/or McAuley. The record simply does not support such a finding.

Defendant is entitled to summary judgment on Count One of Plaintiff's complaint.

## B.    Count Two - Retaliation

Title VII prohibits employers from retaliating against an employee "because he has opposed any . . . unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an

---

plaintiff's accent, saying "Oh, speak English" in a funny accent, and "This is South Florida we do it in southern style, you've got to speak English so I can understand what you're saying." The decision maker also allegedly referred to Haitians as "you Haitians" or "you guys," and that he also said "go, whitey, go" and commented that "Haitians are lazy." 2011 WL 6069362, at *14.

investigation, proceeding, or hearing under this subchapter." Gowski v. Peake, 682 F.3d 1299, 1311 (11th Cir. 2012) (citing 42 U.S.C. § 2000e-3(a)). To establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in statutorily protected activity; (2) that the employer subjected him to a materially adverse action; and (3) some causal connection between the two events. Howard v. Walgreen Co., 605 F.3d 1239, 1244 (11th Cir. 2010). If a plaintiff can establish a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the challenged employment action. Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008). Then the burden moves back to the plaintiff to show that the employer's proffered reasons were merely pretext to mask discriminatory actions. Bryant v. Jones, 575 F.3d 1281, 1307 (11th Cir. 2009).

Under 42 U.S.C. § 2000e-3(a), there are two types of statutorily protected activities that may form the basis of a retaliation claim. The first stems from the "participation clause," which protects an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The second type of activity is found in the "opposition clause," which protects an employee who "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). The distinction between the two types of

activities is that acts protected by the participation clause generally occur in conjunction with or after the filing of a formal charge with the EEOC. Vinson v. Dep't of Corrections, Fla., 672 F.Supp.2d 1247, 1254 (N.D. Fla. 2009). On the other hand, activities protected by the opposition clause generally occur prior to the filing of a formal charge with the EEOC. Id. An employee who seeks protection under the opposition clause must show that he "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311-12 (11th Cir. 2002) (quotation omitted). It is "not enough for a plaintiff to allege that his belief in this regard was honest and bona fide, the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." Id. at 1312 (quotation omitted). Further, "[i]t is not enough for the employee merely to complain about a certain policy or certain behavior of co-workers and rely on the employer to infer that discrimination has occurred." Webb v. R & B Holding Co., Inc., 992 F.Supp. 1382, 1389 (S.D. Fla. 1998).

Plaintiff contends he engaged in statutorily protected expression on three separate occasions. The first was the conversation with Hettinger in early 2010 about Plaintiff working on the night shift. The second was the conversation with Hettinger in late June of 2010 when Plaintiff gave his two weeks' notice. The third was the conversation with Hettinger and McAuley in July of 2010.

As discussed in more detail in Section I *supra*, during the early 2010 conversation, Plaintiff complained to Hettinger that he wanted to be moved back to the day shift. Plaintiff told Hettinger that Hart did not treat him the same as the other employees and that Hart routinely berated him. Plaintiff was subsequently moved back to the day shift. During the July 2010 conversation with Hettinger and McAuley, Plaintiff said he did not want to resign and asked about being transferred to another department, but was told either there were no open positions or that he made too much money for the entry-level positions that were available.

As for the June 2010 conversation, the Court must address an issue raised by Defendant and also noticed independently by the Court upon review of the materials submitted. The Eleventh Circuit in Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc. outlined the sham affidavit rule and held that a district court on a motion for summary judgment may disregard an affidavit which is a sham. 736 F.2d 656, 657 (11th Cir. 1984). "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Id.

To strike an affidavit as a sham, the court must find "some inherent inconsistency between an affidavit and a deposition before disregarding the

affidavit." Rollins v. TechSouth, Inc., 833 F.2d 1525, 1530 (11th Cir. 1987). "Thus, a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by filing an affidavit contradicting earlier deposition testimony." Johnson v. Louisville Ladder, Civil Action No. 07-764-KD-M, 2008 WL 5122261, at *5 (S.D. Ala. Nov. 14, 2008) (citing Tippens v. Celotex Corp., 805 F.2d 949, 954-55 (11th Cir. 1986)). "Such affidavits may be considered when the affidavit contains a satisfactory explanation of the contradictions between the affidavit and the affiant's earlier deposition testimony, or when newly discovered evidence furnishes a good faith basis for any inconsistency between the two." Id. (citing Clay v. Equifax, Inc., 762 F.2d 952 (11th Cir. 1985)).

"A court must be careful to distinguish 'between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.'" Faulk v. Volunteers of Am., 44 F.App'x 316, 318 (11th Cir. 2011). "Every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition." Tippens, 805 F.2d at 954.

The Eleventh Circuit has dictated that courts are to "apply this rule sparingly because of the harsh effect this rule may have on a party's case,"

because allowing "every failure of memory or variation in a witness' testimony to be regarded as a sham would require far too much from lay witnesses and would deprive the [jury] the traditional opportunity to determine which point in time and with which words the affiant was stating the truth." Rollins, 833 F.2d at 1530. To disregard an affidavit, the court must find "some inherent inconsistency" between the deposition testimony and the affidavit. Id.

Plaintiff testified at his deposition about the June 2010 meeting as follows:

> Q    Let's talk about that conversation. You come into Dennis's office sometime in early July of 2010, and you tell him that you're putting in your two-week notice and you're going to quit, correct?
> A    Correct.
> Q    Do you remember what day that was or when that was? Can you be more specific than early July?
>
> ***
>
> A    It had to be in June, that last week in June, last two weeks in June.
> Q    Are you sure about the date, or are you just trying to -
> A    I'm not sure.
> Q    So it could be early July, possibly?
> A    Before July 4th.
> Q    The reason you told him that you were quitting was because you didn't like working nights and you didn't like being cross-trained?
> A    I didn't like working around Gaynor.
> Q    Did you tell Dennis that was the reason?
> A    Yes, that I didn't like working with Gaynor and I wanted to be moved.
> Q    You wanted to be moved. Were there any vacancies anywhere in the plant that you were qualified for?
> A    Yes.
> Q    What vacancies were there?
> A    I wanted to go down to tubing.

***

Q    You believe there was a vacancy in tubing in early July when you went and talked to Dennis?

A    Yes. They told me I was making too much money to go down there.

Q    So going to tubing would have been a pay -- the guys made less than what you were making?

A    Correct.

Q    Did you want to go to tubing and make your same salary, or did you want to take a pay cut?

A    I wasn't going to take a pay cut.

Q    You weren't going to take one?

A    No.

Q    Did you also report to Dennis that you didn't want to be cross-trained or work in the piping department?

A    No.

Q    Did you give him any reason for why you wanted to quit other than you didn't like working with Gaynor?

A    Gaynor had me doing all type of things.

Q    You said he had you outside picking up trash and spraying for weeds.[12] What else did he have you doing that you didn't like doing?

A    He had me working up underneath the boiler, and I didn't know nothing about it at that time, and he was cussing me.

Q    Gaynor was cussing you?

A    Correct.

Q    What was Gaynor saying?

A    Get your ass back up under that boiler.

Q    Was that part of the painting job?

A    No. Piping.

Q    So you didn't like doing the piping work underneath the boiler?

A    I didn't have no other choice but to do it.

Q    But you didn't like doing that work?

---

[12] Plaintiff testified earlier in his deposition that at the June meeting with Hettinger he complained that Hart made him spray for weeds and pick up paper outside the plant. But as noted *supra*, both black and white employees were required to clean up the outside of the plant.

27

A    I was 50 years old. I mean, I had to do it. I had to provide for my family.

Q    The reason that they had you working underneath the boiler doing piping was that they were trying to get you cross-trained, right?

A    Correct.

Q    They wanted everybody in the plant to be cross-trained to be able to do different type jobs?

A    Correct.

Q    The reason for that is if the work got slow in one department, they could move an employee to work in a different department, correct?

A    Correct.

Q    So the fact that you were being cross-trained in the piping department, you weren't being treated differently than anybody else, right?

A    I was being treated different.

Q    How were you treated different?

A    I look up and he always standing over me, and he'll go around other people, laughing and talking about me.

Q    So you were treated differently by Gaynor because he would stand over you and he would talk to other people about you?

A    Correct.

Q    What would he say to other people about you?

A    He said to the other guys that I better speed up or else I would be looking for another job.

Q    Anything else he told them as far as you know?

A    No.

(Williams Dep., p. 46, ln. 13-21; p. 47, ln. 1-21; p. 48, ln. 15-25; pp. 49-50; p. 51, ln. 1-18).

Q    So going back to your conversation with Dennis in early July of 2010, you told him that you were putting in your two weeks notice unless you were transferred to a different department?

A    Correct.

Q    Was Dennis able to transfer you to a different department?

A    No.

Q    Did the two of you agree upon a date that would be your last day?

28

A      No. I changed my mind.

(Williams Dep., p. 52, ln. 2-13).

Q      We've talked about these two separate conversations.
       I want to make sure you've testified to everything that
       you can remember about those two conversations.
       So is there anything else you haven't told us that you
       can   remember   about   either   of   those   two
       conversations?
A      No.

(Williams Dep., p. 55, ln. 6-13).

However, in his affidavit submitted in support of his summary judgment

response, Plaintiff states that the following occurred at the June meeting:

    40.    Around late June, I went to Hettinger's office to
           complain about Hart. Joseph McAuley, the Plant
           Manager, was in Hettinger's office as well.

    41.    I told them both about the constant abuse, that Hart
           treated me differently than other employees, and that
           he was a racist. I told them that it was not fair that he
           denied my vacation time for no reason and that he
           was pushing me to the point of thinking about
           submitting my resignation because I could not stand
           to work under Hart any longer.

    42.    McAuley and Hettinger told me that they would
           approve my vacation request and talk to Hart about
           my complaints. They then told me that I should not
           resign and that we would discuss it again when I
           returned from my vacation.

(Williams Aff., ¶¶ 40-42).

There are several inherent inconsistencies between Plaintiff's deposition

testimony regarding the June meeting and his affidavit testimony. First, there is

no mention anywhere in the deposition that McAuley was present during the

June meeting. Second, Plaintiff clearly stated in his deposition that he told Hettinger that he was putting in his two weeks' notice and was going to quit. This is in direct conflict with his affidavit statement that he was thinking about submitting his resignation. Finally, and most importantly, when asked about the complaints relayed to management about Hart, Plaintiff stated he did not like working around Hart, that Hart had him doing things like picking up trash and spraying for weeds, that Hart would talk about Plaintiff to other people, and that Hart cussed at Plaintiff. At no point did Plaintiff say he complained about Hart being racist or discriminating against him, even after specifically being asked if he remembered anything else about the conversation. Plaintiff tries to salvage his testimony by stating in his affidavit that he did not understand the question, but that explanation holds no weight, as the question he purportedly did not understand had nothing to do with the June meeting. Plaintiff specifically said no when asked if there was anything else to say about the conversation. He was unequivocal. Plaintiff did not say "maybe" or "I don't know" or "I can't remember." It was only after Defendant filed its motion that Plaintiff suddenly remembered complaining about the very actions necessary to establish a prima facie case of retaliation. Plaintiff is trying to save his retaliation claim by stating in his affidavit that he complained about racial discrimination. This sort of manipulation is the reason behind the sham affidavit rule, and the Court finds that it is applicable in

this case. Paragraphs 40-42 of the affidavit are a sham submitted only to create a genuine issue of material fact as to the retaliation claim and will accordingly be disregarded by the Court.

Upon review, the Court finds that the late June two weeks' notice conversation with Hettinger and the July conversation with Hettinger and McAuley were not protected activities sufficient to meet the first prong of the retaliation test. Thus, the Court is left with only the early 2010 conversation with Hettinger about Plaintiff working on the night shift. Even assuming that conversation constitutes protected activity, Plaintiff cannot show a causal connection between that protected activity and the adverse employment action - his termination.[13]

To establish a causal connection, Plaintiff must establish that the protected activity and the adverse action "are not completely unrelated." Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1457 (11th Cir. 1998) (internal quotation marks omitted). "[A] plaintiff satisfies [the causation] element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action." Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999).

---

[13] It should also be pointed out that Plaintiff got what he wanted out of this conversation - a switch back to the day shift.

The problem here is with temporal proximity. There is no evidence in the record as to when the conversation occurred. Obviously it was sometime while Plaintiff worked the night shift, which according to his payroll records he did starting on April 12, 2010, but the Court cannot guess as to when the conversation happened. It is improper for the Court to make any assumptions about the proximity of events. And it makes a significant difference whether the conversation occurred in April as opposed to May, which is when it appears that Plaintiff was moved back to the day shift, as it is well established that a three month period between a protected activity and a materially adverse employment action, standing alone, is too long to infer causation. *See* Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that three months between a protected activity and an adverse employment action, standing alone, failed to establish a causal connection of retaliatory discharge); *see also* Summers v. Winter, 303 F.App'x 716, 720 (11th Cir. 2008); Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). As Plaintiff has presented no other evidence of causation, the Court finds that Plaintiff cannot establish a prima facie case for retaliation. Thus, the retaliation claim fails as a matter of law.

**IV.    CONCLUSION**

For the reasons discussed above, Defendant's Motion for Summary Judgment (Doc. 21) is granted. The Clerk of Court is directed to enter final judgment in favor of Defendant.


**SO ORDERED**, this the 11th day of December, 2012.

> _**s/ Hugh Lawson**_
> **HUGH LAWSON, SENIOR JUDGE**

mbh